AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  3:21-mj - 1243 - JBT |
| Ramone Astin | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   February, 2021 through April, 2021   in the county of _____ Duval _____ in the
____ Middle ____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to possess with intent to distribute and to distribute controlled substances |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Alyse Simmons, Special Agent, ATF
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   4/12/21

_____
*Judge's signature*

City and state:   Jacksonville, Florida

Joel B. Toomey, United States Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS

I, Alyse Simmons, being duly sworn, declare and state the following:

### INTRODUCTION

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been in that position since 2015.  I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7). As such, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.  I have successfully completed the Criminal Investigators Training Program Academy and the ATF Special Agent Basic Training Program at the Federal Law Enforcement Training Center located in Glynco, Georgia.  I am currently assigned to the ATF Tampa Field Division, Jacksonville Field Office.

2.     During my employment as an ATF Special Agent, I have been involved in numerous investigations involving violations of firearms and narcotics laws, resulting in the arrest of numerous criminal defendants and the seizure of illegal firearms and narcotics.  I have trained in and conducted investigations dealing with violent crimes and the importation and distribution of illegal drugs, including methamphetamine, cocaine, cocaine base, heroin and marijuana.  During these investigations, I have conducted physical and electronic surveillance, overseen controlled purchases of illegal narcotics, and executed search warrants.  I have also assisted in a state level Title III investigation.  I have spoken with numerous drug dealers, gang members, and informants about the methods and practices of drug

traffickers.  Further, my duties include, but are not limited to, the execution of orders issued by the court, the execution of search warrants and arrests, the seizure of proceeds associated with the illegal distribution of controlled substances, making affidavits to the court, and affecting arrests for violations of federal law.

3.      I make this affidavit in support of an application for the issuance of criminal complaints charging **Kimberly Michelle Claridy WALKER** (hereinafter "**KIMBERLY W**"), **Neal Merrell WALKER** (hereinafter "**NEAL W**"), **Marquez Maurice MICKLER**, a/k/a "**QUEZ**" (hereinafter "**MICKLER**"), **Marcus Antonio PETERSON** (hereinafter "**PETERSON**"), **Alfred Eugene BELL,** a/k/a "**JUNIOR**" (hereinafter "**BELL**"), and **Ramone ASTIN** (hereinafter "**ASTIN**") with conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846.  As set forth below, there is probable cause to believe that from on or about ~~October 3, 2019~~ February, 2021 (AB) AT, and continuing through on or about April 8, 2021, in the Middle District of Florida, **KIMBERLY W, NEAL W, MICKLER, PETERSON, BELL,** and **ASTIN** committed this federal offense.

4.      The information contained in this affidavit is based on my personal knowledge as derived from my participation in this investigation, as well as the information, observations, and investigations of other federal, state, and local law enforcement officers, and my review of records and other documents.  This affidavit also contains information from controlled purchases of narcotics as well as information gleaned from the court-authorized interception of telephone calls and

text messages to and from telephone number **(904) 525-6808** (hereinafter "**TARGET TELEPHONE 1**"), known to be utilized by **BELL**, and telephone calls and text messages to and from telephone number **(904) 603-9996** (hereinafter "**TARGET TELEPHONE 2**") and telephone number **(904) 719-3330** (hereinafter "**TARGET TELEPHONE 3**"), both known to be utilized by **KIMBERLY W**. Other sources of information include physical surveillance conducted by me and other law enforcement officers as well as cellular telephone pen register and trap and trace information and GPS location data, as described below.

5.    On February 3, 2021, in Case No. 3:21-MC-6-J-34MCR, United States District Judge Marcia Morales Howard authorized the interception of telephone calls and text messages to and from **TARGET TELEPHONE 1**. On March 23, 2021, in the same case, Judge Howard authorized the interception of telephone calls and text messages to and from **TARGET TELEPHONE 2** and **TARGET TELEPHONE 3**.

6.    I have reviewed transcripts and summaries of select pertinent intercepted calls among **BELL** and **KIMBERLY W** and their known co-conspirators, including **NEAL W**, **MICKLER**, **PETERSON**, **ASTIN**, Brandiesa WALKER, a/k/a "Tye" (hereinafter "BRANDIESA W"),[1] Porschee WALKER

---

[1]    According to records in the Florida Driver and Vehicle Information Database ("DAVID"), which I have reviewed, BRANDIESA W is the daughter of **KIMBERLY W**.

(hereinafter "PORSCHEE W"),[2] Ashley WALKER (hereinafter "ASHLEY W"),[3] and others.  These calls were transcribed by law enforcement-affiliated monitors, and transcripts of calls pertinent to the search warrant application are set forth below.

<u>**FACTS ESTABLISHING PROBABLE CAUSE**</u>

7.      On February 10, 2021, at 0908 hours, agents intercepted an outgoing call to **KIMBERLY W**, utilizing **TARGET TELEPHONE 2**, from **BELL**, utilizing **TARGET TELEPHONE 1**.  I have listened to the recording of this call and reviewed a transcript of the call.  This intercepted communication is transcribed below:

AB:    [UI]

KW:    Hey, what's going on?

AB:    [UI] one more thing did, um,  did Quez[4]. . . Quez put the empty bags in the count did he?  He told you about it [UI].

KW:    No.

AB:    He said he was going to tell you about it.

---

[2]      According to records in DAVID, which I have reviewed, PORSCHEE W is the daughter of **KIMBERLY W**.

[3]      According to records in DAVID, which I have reviewed, **ASHLEY W** is the daughter of **KIMBERLY W**.

[4]      From facts learned during this investigation, including intercepted calls in which **MICKLER** was a participant, I know that "Quez" is a nickname for **MICKLER**.

KW:   Ugh, yea, he told me.  Yea, he told me about it but I want you to throw

em . . . I want you to take em and throw em out down the road so that

nobody won't grab em up and claim they was in there in they count.

AB:   Okay, okay, I gotcha.

KW:   Okay, alright.

[END OF CALL]

8.      Based on the training and experience of the agents and in the context of this investigation, I believe that **BELL** was contacting **KIMBERLY W** to see if **MICKLER** had told her about counting the empty bags of narcotics in his shift count.  **KIMBERLY W** initially said that he did not tell her, but after **BELL** told her that **MICKLER** was going to tell her about it, she stated that he already did. **KIMBERLY W** then directed **BELL** to throw the empty bags that had contained the narcotics out down the street so that no one else will take them and try to use them in their shift count.

9.      On February 22, 2021, at approximately 0735 hours, United States Customs and Border Protection ("CBP") Air and Marine Agents Tom Anderson and Ryan Muller established aerial surveillance of **NEAL W** in Jacksonville, Florida. **NEAL W** was observed driving a white BMW sedan, bearing Florida tag KNGH47. Agent Anderson piloted the aircraft as Agent Muller operated the on-board sensor, camera, and recorder.  The agents later placed these recordings on a disk, a copy of which I obtained on February 23, 2021.  On February 24, 2021, Drug Enforcement

Administration ("DEA") Task Force Officer ("TFO") Richard Conger and I viewed the recording and observed the following.

10. On February 22, 2021 at approximately 0736 hours, **NEAL W**'s BMW was observed traveling East on 103rd Street near Ricker Road. At approximately 0738 hours, the BMW was observed turning North onto Daniel Terrace and arrived at the Hospitality Inn and Suites located at 7071 103rd Street. **NEAL W** could be seen exiting the vehicle and entering a hotel room on the northwest corner at approximately 0741 hours. He then returned to his vehicle at approximately 0743 hours. He entered his vehicle and departed, heading west on 103rd Street. The BMW was observed turning south onto Shindler Drive at approximately 0750 hours. At approximately 0753 hours, the BMW was observed turning west onto Hipps Road and then south onto Exline Road where he met with a black female and picked up a small child at approximately 0755 hours. He then departed, heading south on Exline Road, and traveled to the Cedar Hills Baptist Christian School located at 4200 Jammes Road, arriving at approximately 0806 hours. He was observed dropping the child off at the school and he departed north on Jammes Road at 0814 hours. He then traveled to a residence at 1777 East 28th Street at approximately 0845 hours and stopped his vehicle in front of the residence.

11. At approximately 0847 hours, a male subject entered the passenger side of **NEAL W**'s vehicle, and **NEAL W** was observed exiting and then reentering the driver side of the BMW. He then drove to Ollie's Kitchen located at 1733 East 21st Street and entered the restaurant, exiting the restaurant at approximately 0851 hours.

6

He entered his vehicle and departed west on East 21st Street and proceeded to head south on Phoenix Avenue and then west on 14th Street, arriving at 1044 East 14th street at approximately 0855 hours. He then exited the vehicle, approached the front door of the residence, then walked back to his vehicle, and departed at approximately 0856 hours. As discussed below, the residence at 1044 East 14th Street is a known "trap house".[5]

12.     On February 24, 2021, at approximately 0735 hours, CBP Air and Marine Agents James Kaffenberger and Tim Davenport established aerial surveillance of **NEAL W** in Jacksonville, Florida. He again was driving his white BMW sedan. Agent Kaffenberger piloted the aircraft as Agent Davenport operated the on-board sensor, camera, and recorder. The agents later placed the recordings on a disk, a copy of which I obtained on February 24, 2021. On February 24, 2021, TFO Conger and I reviewed the video surveillance, and observed the following.

13.     On February 24, 2021, at approximately 0749 hours, **NEAL W**'s BMW was observed parked at 7253 Michael Terrace, Jacksonville, Florida 32222.[6] The

---

[5]     I know from training and experience that a "trap house" is term commonly used to describe a residence where illegal narcotics are sold.

[6]     7253 Michael Terrace, Jacksonville, Florida 32222 is the listed address for **KIMBERLY W** and **NEAL W** in DAVID records, which I have reviewed. Furthermore, 7253 Michael Terrace is the address used by **KIMBERLY W** for her cellular telephone accounts for **TARGET TELEPHONE 2** and **TARGET TELEPHONE 3**. In addition, on numerous physical surveillance operations, vehicles registered to **KIMBERLY W** and **NEAL W** have been observed at 7253 Michael Terrace. GPS location data obtained from **TARGET TELEPHONE 2** and **TARGET TELEPHONE 3**, as well as cellular telephone number **(904) 803-6381**,
(continued)

7

vehicle departed the neighborhood and headed north on Exline Road and traveled to Cedar Hills Baptist Christian School located at 4200 Jammes Road. **NEAL W** arrived at the school at approximately 0805 hours. **NEAL W** then departed the school and headed north on Jammes Road at approximately 0811 hours, and traveled to 1521 East 27th Street[7] and met with a black male at approximately 0833 hours, in what appeared to be a narcotics exchange. **NEAL W** then departed at approximately 0833 hours and arrived at Ollie's Kitchen located at 1733 East 21st street at approximately 0835 hours, and departed the restaurant at approximately 0839 hours.

14.     **NEAL W** then arrived at 1044 East 14th Street at approximately 0843 hours. An unidentified individual then exited through the front door of the 14th Street "trap house" and walked to the driver's side window of the vehicle and made contact with **NEAL W** for approximately one second. **NEAL W** then departed at approximately 0844 hours and returned to Ollie's Kitchen at approximately 0849

---

known to be used by **NEAL W**, verify that **KIMBERLY W** and **NEAL W**'s cellular devices are often located at 7253 Michael Terrace. For all of these reasons, I believe that 7253 Michael Terrace is the primary residence of **KIMBERLY W** and **NEAL W**.

[7]     According to records in DAVID, which I have reviewed, 1521 East 26th Street is the registered address for Maurice Lavante Williams. During a previous ATF investigation, Williams, also known as "Bud", sold α-Pyrrolidino-pentiophenone ("a-PVP") to an ATF confidential source. Commonly called "flakka", a-PVP is a "designer drug" that is similar to the street drug known as "bath salts."

hours.  He entered the business empty handed, and then walked out of the business with a brown paper bag less than a minute later.

15.    **NEAL W** then traveled to 1516 West 9th Street, arriving at approximately 0901 hours.  He exited the vehicle and walked to the front of the residence.  After a short period of time, he re-entered the vehicle and departed the residence at approximately 0903 hours.  He traveled to the Courtyard Apartments located at 1606 King Street, arriving at approximately 0914 hours.  He exited his vehicle and walked toward apartment number 2.  He then returned to his vehicle and departed at approximately 0915 hours.  He then traveled to Walker's Food Mart located at 2882 Fitzgerald Street, arriving at approximately 0922 hours.  Shortly thereafter the video recording ends.

16.    On March 23, 2021, at 2210 hours, agents intercepted an outgoing call to **MICKLER**, utilizing **(904) 719-2896**,[8] from **TARGET TELEPHONE 3**.  An unidentified male ("UM") could be heard in the background of the call.  The call is transcribed below.

MM:  Hello

KW:  What we lookin' like on white out there?

---

[8]    This telephone number is attributed to **MICKLER** in a Florida Highway Patrol report (which I have reviewed) dated May 7, 2019, in which **MICKLER** received a notice to appear for possession of not more than 20 grams of marijuana.

MM: Bout two more, that's it.  I got, uh, yeah, two more, yeah we bout an

eight, bout ten.

KW: Alright.

UM: [In background] I'll be right back.

MM: Alright.

[CALL ENDS]

17.     Based on the training and experience of the agents and in the context of this investigation, I believe that **KIMBERLY W** was contacting **MICKLER** to see how much narcotics, specifically "white", believed to be in reference to a-PVP,[9] was at the "trap house" located at 1044 E. 14th Street.  **MICKLER** stated that he had about two more, possibly referring to large bags containing pre-packaged narcotics. When **MICKLER** stated "about eight" and then corrects himself and states "about ten," I believe, in view of the content of later intercepted text messages that are detailed, that "eight" and "ten" refer to 800 and 1000 pre-packaged bags of "white", possibly a-PVP.

18.     On March 23, 2021, at 2218 hours, agents intercepted an incoming call from **MICKLER**, utilizing **(904) 719-2896**, to **TARGET TELEPHONE 3**.  The call is transcribed below.

KW: Hello?

MM: [UI]

---

[9]      α-Pyrrolidinopentiophenone, commonly called "flakka".  a-PVP is a "designer drug" that is similar to the street drug known as "bath salts."

KW:   Say what?

MM:   Neal down there to pop some bags?

KW:   [UI] I can't come, I'm trying to get 'em out to you now, I got the baby and shit.

MM:   You was supposed to [UI].

KW:   Alright.

MM:   [UI] he out here waitin' on it [UI] I got these popped bags for Neal to come get

KW:   You got what now?

MM:   I said I got these popped bags [UI]

KW:   Yeah bring them with you, bring them with you come, but I been trying to get some more stuff, and I'm trying to get that out there.  I just told them to contact Smooth Lee or they can come meet Tye at the Bottoms Up to grab 'em cause I can't come, I have the baby.

KW:   [Noise in the background] [UI]

MM:   Naw, we ain't gonna be able to move right now.

KW:   [UI]

MM:   He out here waitin' on it, he ain't going nowhere, he been out here.

KW:   Alright then.

 [CALL ENDS]

19.     Based on the training and experience of the agents and in the context of this investigation, I believe that **MICKLER** was calling **KIMBERLY W** in reference

to the "bags", believed to be bags for pre-packaged narcotics, and he mentioned

**NEAL W**. **KIMBERLY W** stated that she could not bring **MICKLER** anything

because she was at home with a baby, but that she would get "them", believed to be

referring to the bags of narcotics, to him. **KIMBERLY W** then mentioned having

someone contact "Smooth Lee"[10] in reference to getting the "stuff", believed to be

narcotics, out to the "trap house". **KIMBERLY W** also mentioned having someone

meet "Tye[11]" at Bottoms Up, believed to be referring to Bottomz Up Adult

Entertainment, located at 3909 Blanding Blvd., Jacksonville, Florida. **MICKLER**

explained that he was not able to leave at the moment. **MICKLER** then stated that

"he", referring to an unknown third party, is out at the "trap house" waiting on the

narcotics and that this individual was not going to leave.

20.     On March 23, 2021, at 2319 hours, agents intercepted an incoming call

from **BELL**, utilizing **TARGET TELEPHONE 1**, to **KIMBERLY W**, utilizing

**TARGET TELEPHONE 2**. The call is transcribed below.

---

[10]     "Smooth Lee" ("LEE") has been identified as Michael Shaquille LEE, DOB 04/22/1997. According to a JSO report, which I have reviewed, LEE was arrested on October 24, 2020, after JSO conducted a traffic stop of a red 2011 Chevrolet Camaro with Florida tag LBVB19. The driver of the vehicle was identified by JSO as **MICKLER** and the front seat passenger was identified as LEE. I have listened to the recorded jail calls of LEE following this arrest, and LEE identified himself as "Smooth" during those calls.

[11]     I know that "Tye" is a nickname for BRANDIESA W because on BRANDIESA W's Facebook account, which I have reviewed, "Tye" is listed under the heading of "nickname". In addition, after an incident on April 4, 2021, in Lake City, Florida, in which BRANDIESA W was shot twice, KIMBERLY W and others refer to BRANDIESA W as "Tye" in conversations about the shooting that were intercepted on **TARGET TELEPHONE 3**.

AB:    Hey, Miss Kim.

KW:    What's up?

AB:    Hey, Miss Kim, it be okay if I, um, send Leo and them to, um, get it?

KW:    Yeah, long as, yeah, long as it ain't, you know, mixed.

AB:    [UI] he ain't been sitting out there all that time, you know, I ain't gonna
         lie, out there too late.

KW:    Yeah, alright, yeah, it's, it's fine.

AB:    Yeah, cause you know my license, my license bad (laughing).

KW:    Yeah, I gotcha.

AB:    Alright, yeah, yeah.

KW:    Alright

AB:    [UI]

[CALL ENDS]

21.    Based on the training and experience of the agents and in the context of
this investigation, I believe that **BELL** was calling **KIMBERLY W** to see if it was
okay for him to send "Leo" to get the narcotics. **BELL** explained that it was getting
late and that his license was bad. **KIMBERLY W** stated that it was fine.

22.     On March 24, 2021, at 0746 hours, agents intercepted an outgoing call to ASHLEY W, utilizing (904) 616-4875,[12] from **TARGET TELEPHONE 3.**  The call is transcribed below.

AW:  Hello

KW:  Ashley, the two that you, you did last night, was it two full ones or was it [UI]

AW:  158

KW:  Are you tying . . .

AW:  I double bagged the other ones.

KW:  You shouldn't have tied it that tight then.

UM:[13] [In background] Tye ain't got none?

KW: Alright then.

AW: Okay.

UM:  [In background] Tye ain't got none?

KW: [UI]

[CALL ENDS]

---

[12]     Telephone number (904) 616-4875 is listed in law enforcement databases as belonging to ASHLEY W.  According to Jacksonville Electric Authority ("JEA") records, which I have reviewed, telephone number (904) 616-4875 is associated with an active account in the name of ASHLEY W.  In addition, telephone number (904) 616-4875 was listed as ASHLEY W's number in a JSO report of April 3, 2021, regarding a vehicle crash, which I have reviewed.

[13]     Unidentified male.

23.     Based on the training and experience of the agents and in the context of this investigation, I believe that when **KIMBERLY W** asked ASHLEY W if she did "two full ones," she was possibly referring to two "bombs" of controlled substances. "Bombs" are believed to contain 100 bags of controlled substances per "bomb." ASHLEY W replied "158", possibly referring to packaging 158 bags of a controlled substance for distribution. **KIMBERLY W** asked ASHLEY W if she was tying the bags, believed to be referring to physically tying the bag to prevent someone from easily removing one of the smaller bags of the controlled substances inside. ASHLEY W stated that she double bagged the other ones and **KIMBERLY W** advised that she should not have tied them so tight.  I reviewed the GPS location data for **TARGET TELEPHONE 3** at approximately 0737 hours and again at approximately 0752 hours the data showed that **KIMBERLY W**'s cellular telephone's location to be near her residence, 7253 Michael Terrace.  In addition, at approximately 0737 hours and approximately 0752 hours, GPS location data for **(904) 803-6381**, known to be **NEAL W**'s cellular telephone number (as reflected in intercepted calls to and from that number, described below) reflected that **NEAL W** was located at 7253 Michael Terrace.

24.     On March 24, 2021, at 1239 hours, agents intercepted an outgoing text to an unidentified male who was later identified as **Ramone ASTIN**,[14] utilizing **(904)**

---

[14]     Agents have identified **Ramone ASTIN**, a/k/a "**RAY**" ("**ASTIN**"), through recorded jail telephone calls between **ASTIN** utilizing telephone number **(904) 577-4126** and Ronnie Cleveland JOHNSON ("JOHNSON"), who were

(continued)

**577-4126**, from **TARGET TELEPHONE 2**. The text conversation between **ASTIN** and **KIMBERLY W** is detailed below.

> KW:  Have they gotten the bags yet?
>
> RA:  On hold with them now
>
> KW:  Ok
>
> RA:  Also could we get boobie and someone else to help with popping bags?
>
> KW:  Check with Leo and see if he's finished with the rest of the bags he's slowing me down frfr smh
>
> RA:  Yes maam

25.   Based on the training and experience of the agents and in the context of this investigation, I believe that **KIMBERLY W** was asking **ASTIN** if he had gotten the bags for packaging narcotics yet. **ASTIN** replied that he was on hold with them now, believed to be referring to the individual in possession of the bags. **ASTIN** then asked **KIMBERLY W** if he could have "boobie" and someone else help with popping bags, believed to be referring to packaging bags of narcotics for distribution. **KIMBERLY W** instructed **ASTIN** to check with "Leo" and see if he was finished with the rest of the bags, believed to be referring to "Leo" packaging bags of

---

arrested together during a traffic stop on January 31, 2021. During JOHNSON's recorded telephone calls made from the correctional facility, which I have listened to, JOHNSON spoke with **ASTIN** regarding their arrest as well as information regarding the drug trafficking organization. In addition, during a call that was intercepted over **TARGET TELEPHONE 3**, an unidentified female spoke with **KIMBERLY W** about **ASTIN**'s upcoming court date and **ASTIN** was referred to by his full name.

narcotics for sale, and stated that "Leo" is slowing **KIMBERLY W** down in regard to not making the bags fast enough.

26.     On March 24, 2021, at 1559 hours, agents intercepted agents intercepted an outgoing call to **ASTIN**, utilizing **(904) 577-4126**, from **TARGET TELEPHONE 2**.  The call is transcribed below.

RA:     Yes, ma'am?

KW:     Hey, were you able to get [audio glitches] the bags?

RA:     No, I'm gonna call her now.  [UI] I wound up getting both of these packs . . .

KW:     Uh huh [Voices overlap]

RA:     Until, until that full box come in, cause I ain't wanna just have to take them out that full box.

KW:     Okay, so you, so you [Voices overlap]

RA:     I'm, I got, I got two, um, two that's popped now.  I'm alm . . . [Voices overlap]

KW:     Okay [Voices overlap]

RA:     I'm, I'm about at 2800.  I'm at [Voices overlap]

KW:     So what about, um [Voices overlap]

RA:     Twelve, eighteen hundred.

KW:     What about, um, what's his name? [Voices overlap]

RA:     Leo?

KW:     Leo, yeah.

17

RA:   He supposed to bring his 'round here right now.  I just called him and told him to bring it right now cause you on your way.

KW:   Yeah, cause, um, Neal on his way to come.

RA:   Okay.

KW:   Alright, then, um [Voices overlap]

RA:   Alright.

KW:   Cause I need them ASAP.

RA:   Okay. I'm a keep poppin' 'em 'till he get done with his. I'm a have, just keep poppin'.

KW:   Okay.  Alright, then [Voices overlap]

RA:   Alright [Voices overlap]

KW:   That's a bet.

RA:   Okay.

KW:   Alright.

[CALL ENDS]

27.     Based on the training and experience of the agents and in the context of this investigation, I believe that when **KIMBERLY W** asked **ASTIN** if he was able to get the "bags", she was referring to the bags used to package narcotics. **ASTIN** said no, and mentioned calling a female. **ASTIN** then mentioned a "full box", possibly referring to a full box of bags, and then stated that he has two popped and that he had about twelve to eighteen hundred, believed to be referring to the number of bags for pre-packaging narcotics. **KIMBERLY W** then asked about "Leo" and

**ASTIN** stated that "he", referring to "Leo", was supposed to bring "it" right now.  I believe that this is in reference to **KIMBERLY W** and **NEAL W** having multiple individuals helping package narcotics for distribution and that "Leo" would be bringing the bags that he had completed, as was referenced in the previous text message conversation between **KIMBELY W** and **ASTIN**.  **KIMBERLY W** stated that **NEAL W** was on his way, believed to be referring to **NEAL W** picking up the completed bags of pre-packaged narcotics.  **KIMBERLY W** stated that she needed them ASAP and **ASTIN** stated that he would continue to work on the remaining bags.

28.     On March 24, 2021, at 2025 hours, agents intercepted an outgoing call to **NEAL W** utilizing **(904) 803-6381**, from **TARGET TELEPHONE 2**.  The call is transcribed below.

NW:  What's up, baby?

KW:  You ever pick up them bags to take to [UI]?

NW:  Yeah, I got the bags with me.

KW:  [UI]

NW:  You want me to take them to Porschee?

KW:  [No audio]

NW:  What'd you say, babe?  I can't hear you.  Why you talkin' so low?

KW:  [UI] You gotta take the bags to Porschee at the gas station.

NW:  Okay, okay, okay, alright.

19

KW:  Alright.

NW:  Alright, babe.

[CALL ENDS]

29.     Based on the training and experience of the agents and in the context of this investigation, I believe that when **KIMBERLY W** asked **NEAL W** if he had picked up bags, she was referring to bags used to package controlled substances. **NEAL W** advised that he had the bags with him and asked if **KIMBERLY W** wanted him to take the bags to **PORSCHEE W**.  **KIMBERLY W** answered in the affirmative and told **NEAL W** to take the bags to **PORSCHEE W** at the gas station, believed to be referring to a BP gas station run by **KIMBERLY W**.

30.     In November, 2019, a  confidential source ("CS1") began cooperating with ATF.  I have met with, interviewed, and spoken on the telephone with CS1 on numerous occasions.  I have corroborated information CS1 has conveyed to me through recorded telephone calls and meetings with the subjects of this investigation, physical surveillance, telephone toll records, information from other cooperating sources, and information obtained from various public databases, and I have found the information that CS1 has provided to me to be reliable.  In addition to this investigation, CS1 has also provided information regarding other ATF investigations and that information was corroborated and determined to be reliable by ATF.  CS1 has also provided information to the Jacksonville Sheriff's Office ("JSO") and that information was corroborated and determined to be reliable.  CS1 receives financial

compensation from ATF for the assistance CS1 provides to ATF. CS1 is willing and able to testify with regard to this investigation.

31.    CS1 has the following criminal history. On August 25, 1987, CS1 was arrested for carrying a concealed weapon, charges were dropped/abandoned. On March 17, 1988, CS1 was arrested for possession of cocaine, with a felony conviction, sentenced on March 28, 1988, to 1 year of probation. On November 30, 1988, CS1 was arrested for sale, purchase, or delivery of cocaine, with a felony conviction, sentenced on April 12, 1989, to prison for 4 years. On February 13, 1991, CS1 was charged with driving while license is suspended or revoked, sentenced on March 19, 1991, to court costs. On April 3, 1991, CS1 was arrested for loitering or prowling, resisting an officer without violence, and carrying a concealed weapon, with misdemeanor convictions for all charges, sentenced on August 22, 1991, to 45 days in jail. On July 29, 1991, CS1 was arrested for driving with license suspended or revoked, unlawful to alter license plate, and resisting a police officer, with a misdemeanor conviction for driving while license suspended or revoked, sentenced on August 22, 1991, to 1 month and 15 days in jail. On August 16, 1991, CS1 was arrested for burglary assault or carries weapon, possession of cocaine while armed, and possession of a firearm, with felony convictions for possession of cocaine while armed and possession of a firearm, sentenced on October 14, 1991, to prison for 3 years and 6 months. On October 10, 1991, CS1 was arrested for battery and damaged property-criminal mischief, with misdemeanor convictions for all charges, sentenced on October 15, 1991, to 30 days in jail. On July 28, 1992, CS1 was

arrested for possession of cocaine, with a felony conviction, sentenced on October 1, 1992, to 1 year of probation.  On July 15, 1994, CS1 was arrested for carrying a concealed firearm, operating a motor vehicle with expired registration, and possession of cocaine, with felony convictions for carrying a concealed firearm and possession of cocaine, sentenced on August 11, 1994 to 5 months in jail.  On July 28, 1995, CS1 was arrested for robbery, kidnapping, possession of cocaine, possession of cannabis, and possession of drug paraphernalia, with felony convictions for robbery and kidnapping, sentenced on March 27, 1997, to prison for 7 years.  On April 1, 2001, CS1 was arrested for possession of a firearm by a convicted felon, with a felony conviction, sentenced on June 25, 2003, to prison for 5 years.  On February 2, 2010, CS1 was arrested for domestic battery, with a misdemeanor conviction, sentenced on May 21, 2010, to 5 days in jail and 12 months of probation.  CS1 has no currently pending charges.

32.     On January 14, 2021, ATF SA Leahy and CS1 drove to the BP gas station located at 6845 Arlington Expressway, Jacksonville, Florida 32211, and entered the gas station convenience store.[15]  SA Leahy proceeded to make a purchase from the store and the clerk working behind the counter was wearing a name tag with the name "Porschee".  On January 15, 2021, I showed SA Leahy and CS1 a

---

[15]     During the investigation, another confidential source told me that **KIMBERLY W** owned this gas station.  This information was corroborated through physical surveillance as well as an interview that was conducted of **KIMBERLY W** by News4Jax on June 28, 2020, the audio/video recording of which I have reviewed (available on YouTube, https://www.youtube.com/watch?v=v5EOR9Ouuvs).

photograph of PORSCHEE W obtained from DAVID, and SA Leahy and CS1

positively identified PORSCHEE W as the individual working at the gas station.

33.     On March 29, 2021, I was present with members of ATF, JSO, the

Nassau County Sheriff's Office, and the Columbia County Drug Task Force when

we met at a predetermined location to conduct a briefing of CS1 for the controlled

purchase of illegal narcotics from the 14th Street "trap house". Before conducting the

controlled purchase, SA John Leahy searched CS1 for contraband with negative

results. In addition, SA Leahy, who was working in an undercover capacity,

equipped CS1 with audio/video recording equipment. I provided CS1 with $100.00

in ATF funds for the purchase of illegal narcotics from the 14th Street "trap house".

CS1 then entered an undercover vehicle with SA Leahy and SA Leahy then drove

towards the 14th Street "trap house".

34.     I observed this controlled operation by reviewing the audio and video

recordings on March 29, 2021, as well as debriefing CS1 and SA Leahy.

Furthermore, during this operation I acted as a surveillance unit and listened to and

viewed an audio/video transmission of the controlled purchase in real time.

35.     SA Leahy and CS1 arrived at 1044 E 14th Street at approximately 1049

hours. SA Leahy parked the undercover vehicle in front of the residence. SA Leahy

had to immediately move the undercover vehicle because a vehicle that was parked

in the driveway was attempting to leave the residence. SA Leahy drove a few houses

down the street, turned around, and parked the vehicle again. CS1 exited the vehicle

and walked up the driveway to the rear of the residence. SA Leahy lost sight of CS1

as CS1 walked around to the rear of the residence. After a brief period, CS1 returned to the undercover vehicle and gave SA Leahy the suspected illegal narcotics that CS1 had purchased, which were contained in ten (10) small clear plastic baggies. SA Leahy and CS1 left the "trap house" at approximately 1052 hours.

36.     SA Leahy and CS1 drove to a predetermined location where SA Leahy turned off the electronic surveillance equipment. SA Leahy searched CS1 for contraband with negative results. I took custody of the suspected narcotics from SA Leahy. During a debriefing, CS1 stated that when CS1 was walking to the rear of the residence, he/she observed an unknown black male walking towards the front of the residence. CS1 believed that this unknown individual possibly possessed illegal narcotics. CS1 reached the rear of the residence and observed an opening in a window. CS1 stated that an unknown black male was inside of the residence at this window area. CS1 described the opening as a slot. CS1 stated that CS1 told this unknown individual that CS1 desired to purchase cocaine, to include cocaine base, also known as crack cocaine. This individual stated that the only illegal narcotics sold from the residence were "flakka" and "molly". I know that "flakka" is a term commonly used to refer to a-PVP and "molly" is a term commonly used to refer to MDMA. CS1 stated that CS1 desired to purchase $50.00 worth of "flakka" and $50.00 of "molly". The unknown individual inside of the residence asked CS1 whom CS1 knew. CS1 stated that CS1 was related to "Junior", the known nickname for **BELL**. The unknown individual told CS1 that **BELL** had just left.

24

The unknown individual gave CS1 a-PVP and MDMA that CS1 asked for.  CS1 then returned to the undercover vehicle and gave SA Leahy the narcotics.

37.     That same day, ATF SA Smalls and I field-tested the suspected narcotics at the ATF Jacksonville Office.  The field test of the suspected a-PVP yielded a positive result for the presumptive presence of a-PVP.  The field test of the suspected MDMA resulted in an inconclusive test of the narcotic and it has been sent to a DEA laboratory for further analysis.  I weighed the a-PVP and it weighed approximately 0.5 grams (with packaging).  I weighed the suspected MDMA and it weighed approximately 3.1 grams (with packaging).

38.     On March 29, 2021, at 1849 hours, agents intercepted an outgoing call to **PETERSON**,[16] utilizing **(386) 288-7264**, from **TARGET TELEPHONE 3**. The call is detailed below.

MP:   Hello.

KW:   I think you the sexiest man in the whole United States of America.

MP:   [Chuckles] Shit, you ain't lying.

KW:   [Chuckles] You ain't blushing over there.

MP:   [Chuckles] [UI]

---

[16]     Telephone number (386) 288-7264 was listed as **PETERSON**'s number in a JSO report, which I have reviewed, discussing a telephone call from **PETERSON** to Sgt. Adams on November 3, 2020.  According to the report, JSO Sgt. Adams spoke with **PETERSON**, who called Sgt. Adams from telephone number **(386) 288-7264** and who identified himself by name.  In addition, according to the report, when **PETERSON** was arrested by JSO on November 4, 2020, he possessed a cellular telephone with a telephone number of **(386) 288-7264**.

KW:   Check it out, check it out, check it out!  One, two, three.  What we looking with the play?

MP:   Uh, I'll call and see what the hell [UI].  She probably [UI].

KW:   Huh.

MP:   I need to call to see.

KW:   I need that bird in the hand no later than tomorrow.

MP:   Alright.

KW:   I gotta get, I gotta get prepared.

MP:   [Chuckles]

KW:   [Chuckles]

[End of pertinent conversation at 00:39]

[Pertinent conversation resumes at 04:17]

KW:   What's the play?  [UI] be made.

MP:   I'll have to see tomorrow.

KW:   [UI]

MP:   I know I gotta come down there [UI].  They be calling one day this week [UI].

KW:   Oh.

MP:   [UI] last week so it should be painted this week.

KW:   Well at 11:30 I gotta go to the base to get this, get this [UI] after that I'm free.

MP:   After 11:30?

KW:  Mm-hm.  I have to go to the base and get all this [UI].

[End of pertinent conversation at 04:45]

[Pertinent conversation resumes at 20:05]

KW:  Oh, lordy.  So, you gonna call when she uh [UI] put that in place.

[CALL ENDS ABRUPTLY]

39.     Based on the training and experience of the agents and in the context of this investigation, I believe that **KIMBERLY W** was calling **PETERSON** to see if **PETERSON** had any narcotics available.  **PETERSON** stated that he needed to call and see, possibly referring to calling his source of supply of the narcotics. **KIMBERLY W** then stated that she needed "that bird in the hand no later than tomorrow" and that she needed to be prepared, believed to be referring to the fact that she needed the narcotics the next day.  **PETERSON** later in the conversation stated that he would have to see the next day, and **KIMBERLY W** went over her schedule with **PETERSON** to let him know when she would be available.

40.     On March 30, 2021, I observed active pen register and trap and trace data and GPS location data for **NEAL W**'s cellular telephone, **TARGET TELEPHONE 4**.  Beginning at approximately 1219 hours, **NEAL W** began calling **PETERSON**.  **NEAL W** then contacted **PETERSON** several times at approximately 1219 hours and 1227 hours, and then at approximately 1313 hours, I observed **NEAL W**'s phone location to be in the area of his home at 7253 Michael Terrace, Jacksonville, Florida.  At 1413 hours, **NEAL W**'s GPS location data placed him in

27

the area of Interstate 10 ("I-10") just west of State Road 301. At approximately 1413 hours, **NEAL W** received an incoming voice call from **PETERSON**. The duration of this call was approximately one second. At approximately 1413 hours, **NEAL W** received an incoming text message from **PETERSON**.

41.     On March 30, 2021, at 1416 hours, agents intercepted an incoming call from BRANDIESA W, utilizing (904) 575-1844,[17] to **TARGET TELEPHONE 3**. The pertinent portion of the call is detailed below.

> KW:   Hello?
>
> BW:   Hey, ma?
>
> KW:   Yeah-- [Voices overlap]
>
> BW:   You ain't, you ain't need them nine from the house?
>
> KW:   Huh?
>
> BW:   I say you ain't need them nine from the house?
>
> KW:   Y . . . not right now.
>
> BW:   Oh.  You got some more stuff?
>
> KW:   I'm, I'm, I'm in the process now.
>
> BW:   Oh.  I only got on . . . I was gonna say, cause I only got one left.
>
> KW:   Uh, alright, I got you.  Uh, where you at?
>
> BW:   Leaving the warehouse.

---

[17]     Telephone number (904) 575-1844 was listed as BRANDIESA W's number in a Jacksonville Sheriff's Office ("JSO") report of July 20, 2020, which I have reviewed.

KW:  Damn I needed you to grab . . . I didn't know you was going to the warehouse.

BW:  What you, what you had needed.

KW:  I just needed outside snacks.

BW:  Oh.

KW:  A few of the little, uh [UI]

BW:  I got . . .

KW:  Huh?

BW:  I said, um, I still got to go back, I prolly come back Thursday, or y'all need 'em like asap?

KW:  Ok.  Alright then.

[End of pertinent conversation at 00:50]

42.    Based on the training and experience of the agents and in the context of this investigation, I believe BRANDIESA W was advising **KIMBERLY W** that she only had one, referring to an unknown quantity of a controlled substance. **KIMBERLY W** stated that she was in the process of getting more, believed to be in reference to **KIMBERLY W** and **NEAL W** being on their way to meet with **PETERSON** for resupply of narcotics.  **KIMBERLY W** stated that she needed "outside snacks", believed to be referring to small bags of narcotics used as payment for individuals working outside of the "trap house" location.

29

43. At approximately 1419 hours, **NEAL W** placed an outgoing voice call to **PETERSON**. The duration of this call was approximately 35 seconds. At approximately 1420 hours, **NEAL W** placed an outgoing voice call to **PETERSON**. The duration of this call was approximately 35 seconds. I have reviewed the GPS location data for **TARGET TELEPHONE 3** and the data to show **KIMBERLY W**'s location at approximately 1422 hours to be within a 1553 meter radius of 148 East Blvd. S., Macclenny, Florida.

44. At approximately 1428 hours, **NEAL W**'s GPS location data placed him on I-10 at the Duval County line. The location data for **NEAL W's** cell phone, provided by Sprint, is precise, with an average accuracy of within 2-3 meters. Based on this location data, I believe **KIMBERLY W** and **NEAL W** met with **PETERSON** to purchase of a quantity of a-PVP near Macclenny, Florida, at approximately 1428 hours. By 1448 hours, GPS location data showed **NEAL W** to be in the area of 7253 Michael Terrace. In addition, at approximately 1448 hours, ATF SA David Simmons observed a silver Lexus SUV, consistent with the vehicle later described in this Affidavit as being driven by **KIMBERLY W**, traveling eastbound on Hipps Road to Exline Road where the vehicle turned right and continued to travel south on Exline Road. The vehicle then turned onto Jennifer Boulevard heading west, out of the sight of SA Simmons. Jennifer Boulevard is a point of entry into the neighborhood where 7253 Michael Terrace is located.

45.     On March 30, 2021, at 1516 hours, agents intercepted an outgoing call to BRANDIESA W, utilizing (904) 575-1844, from **TARGET TELEPHONE 3.** During this call, an unidentified female ("UF") can be heard in the background of the call with BRANDIESA W.  The call is transcribed below.

BW:  Hello?

KW:  Where you at?

BW:  Bout to leave soon.

KW:  You, you'll take [audio glitches] [UI] for that, you'll take them [UI], uh [Noises in the background] Porschee drop one, drop it off at 14th.

BW:  Yes, Ma'am.

KW:  To Marquez, uh, and also I got you y'all's stuff in the car.  I'm headed to Winn-Dixie by your house

BW:  Okay.

KW:  Uh, I'm meeting Ashley, too, the Wendy's down the road first, then I'm going, so I, I guess I'll meet you on your way coming from out there.

BW:  Okay.  Excuse me.

KW:  Alright then, well don't forget to, um, grab that and take it, drop it off [audio glitches]

BW:  I'm getting up, I'm fixing to get it now.  Trig, hand me that.

KW:  And tell, tell Axe her, where she want me to leave her stuff, your house or give it with Ashley.

BW:  Leave it with Ashley.

31

KW:   Huh?

UF:   [In background] Where at?

BW:   Yes, sir.

UF:   [In background] Oh, doing that?

BW:   Yeah.

KW:   No, I say . . .

BW:   She say, where you want her to leave your stuff at?  With Ashley or with me?  She said it don't matter, you can give it to Ashley, too, she's closer.

UF:   [In background] Need bags, too, but I'll have . . .

BW:   She said she needs bags, too.

KW:   I already got, got, I got everybody bags, everybody's stuff.

BW:   She said she got everybody bags [UI] too. You heard me?  She said she got bags and everything.  She said okay.

KW:   Alright, just let me know when you leave 14th so I know where to meet you at.

BW:   Okay.

[CALL ENDS]

46.   Based on the training and experience of the agents and in the context of this investigation, I believe **KIMBERLY W** was asking BRANDIESA W where she was because **KIMBERLY W** had controlled substances, believed to be recently obtained from **PETERSON**, to bring to BRANDIESA W.  **KIMBERLY W** asked

32

BRANDIESA W to deliver suspected controlled substances to the 14th Street "trap house". **KIMBERLY W** stated that she was meeting ASHLEY W at the Wendy's and asked BRANDIESA W if she wanted her supply of controlled substances to be left with ASHLEY W. **KIMBERLY W** advised BRANDIESA W and the unidentified female that she had all their bags of controlled substances to deliver. I reviewed the GPS location data for **TARGET TELEPHONE 3** during this call and the data showed that **KIMBERLY W**'s phone location was near her residence, 7253 Michael Terrace.

47. On March 30, 2021, at 1631 hours, agents intercepted an incoming call from BRANDIESA W, utilizing (904) 575-1844, to **TARGET TELEPHONE 3**. The call is transcribed below.

KW: Hello?

BW: Hey, ma, you [UI] here?

KW: Yeah, I'm coming by there [UI]. Why, what's up? What, what you [UI] Leo?

BW: I [UI] I gotta pick up this food. [UI] some food. [UI] [Voices overlap]

KW: Alright. Well, come on, come on to Bottoms Up. I'll just wait down here at Bottoms Up [UI].

BW: Okay.

KW: Alright.

[CALL ENDS]

48.     Based on the training and experience of the agents and in the context of this investigation, I believe **KIMBERLY W** was talking to BRANDIESA W about meeting at Bottomz Up Adult Entertainment Club, located at 3909 Blanding Blvd., Jacksonville, Florida.  In previous conversations intercepted on **TARGET TELEPHONE 3**, the parties have referred to Bottomz Up as a meeting location for the exchange of narcotics.  I reviewed the GPS location data for **TARGET TELEPHONE 3** during this call and the data showed that at approximately 1622 hours, **KIMBERLY W**'s phone location was within 1411 meters of 3636 Blanding Boulevard.

49.     During this time on March 30, 2021, ATF agents established surveillance of **KIMBERLY W** as she was loading groceries into a vehicle in the Winn-Dixie parking lot at 3538 Blanding Boulevard.  **KIMBERLY W** was observed driving a Lexus SUV bearing Florida Tag IFQP49.  **KIMBERLY W** was known to have been given a loaner vehicle from the Lexus dealership while her vehicle was being worked on.  ATF SA Mallory Sonn established surveillance of an apartment building located at 4455 Confederate Point where BRANDIESA W is believed to live and observed a red Jeep leaving the area.[18]  ATF Agents surveilled **KIMBERLY W** to Bottomz Up Adult Entertainment, where they observed her meeting with the red Jeep believed to be occupied by BRANDIESA W.  ATF Special Agent Barry

---

[18]     According to DAVID, the red Jeep, bearing Florida Tag KCEM07, is registered to EAN Holdings, LLC, Enterprise Rent-A-Car.

Smalls observed BRANDIESA W handing **KIMBERLY W** a black plastic shopping bag, and **KIMBERLY W** handed BRANDIESA W a black plastic shopping bag. Agents believe that during this exchange BRANDIESA W gave **KIMBERLY W** the "outside snacks" she had asked for and **KIMBERLY W** gave BRANDIESA W a quantity of controlled substances, brought from her residence at 7253 Michael Terrace, for BRANDIESA W to package in small bags for sale.  SA Smalls observed the subject believed to be BRANDIESA W wearing a tie-dyed shirt.

50.     Later on this same day, I viewed surveillance video from Walker's Food Store, located at 2882 Fitzgerald Street, Jacksonville, Florida, and observed the same red Jeep arrive.  I observed a black female exit the vehicle wearing a tie-dyed shirt and I was able to positively identify her as BRANDIESA W through photographs of her contained in DAVID records.

51.     On April 3, 2021, at 1336 hours, agents intercepted an incoming call from **NEAL W**, utilizing **(904) 803-6381**, to **TARGET TELEPHONE 3**.  The call is transcribed below.

KW:  What's up, baby?

NW:  Hey, hey.

KW:  Huh?

NW:  I'm, I'm, I'm, I'm going to lock the room through.

KW:  Okay, okay, I got to wait.

NW:  You got the key?

KW:  Um, no, no.  Okay, let me find my keys, let me see . . .wait, I ain't see my keychain.

NW:  Alright, so . . .

KW:  Hey, let me find them, um . . .

NW:  Yeah, I, well I just got to hide everything cause, um . . .

KW:  No, no, go ahead and lock it.

NW:  We . . .

KW:  The keys, my keys ain't in the room.  I know that, they said they prolly in my Audi.

NW:  Okay, so, will we be able to get in the room?

KW:  Yeah.

NW:  You sure?

KW:  Yeah.  Lock it, um . . .

NW:  I'm going to back around.

KW:  Did you see the car?  Did you see the car, babe?

NW:  Yeah, it ain't, it ain't messed up all that bad.

KW:  Oh, it ain't?

NW:  I said, Why you ain't paid the damn insurance?

KW:  I don't know.

NW:  Come on, [UI] man.

KW:  Oh no.

NW: You know, he, he, he ain't . . . like at the same time, you know, we ain't going to use, but you never know.

KW: Yup, cause look what happened.

NW: Yeah, you, you, you want to keep that insurance, that's why I try to make sure my insurance stay paid on my car.

KW: Yeah, you right, I, I, I can, I, I can admit that one, but hopefully, hopefully, um . . . They at fault, she don't have to pay them so, it ain't like we got to, we got to do our thing during the day, we just got, I just got to get the car fixed in the front.  Now maybe they insurance, they insurance prolly got to pay for that.

NW: Uh-huh.

KW: But, from, from here on out, I, I gotta go get insurance.

NW: Uh, better keep it, keep it [UI].  Let me get up outta here.

KW: But see, but see, I got insurance, I got insurance on everything else, but I, by giving the car to Marcus, I was going to have him . . . his daddy put that insurance on there, least, that the least he could of did, so that why I didn't put it on that one, ever.  All the rest, all the rest of the cars got insurance on it, but because that was going to Marcus, I felt like his daddy should, you know, that's the least he could do, is add it on his insurance.

NW: Yeah, uh . . .

37

KW:   So, so, that's the only one that don't got it on there, the Kia ever, the Kia everything got it on there.

NW:   Oh, let me get on up out of here, baby.  I gotta, I gotta, I, I, I, I gotta get them [UI] I gotta, I gotta go out east, gotta stop by the mall first.

KW:   Alright then.

NW:   Alright, let, let me get on cause I'm already late.  Hey, I locked the door.

KW:   Alright then, alright, okay.

[CALL ENDS]

52.     Based on the training and experience of the agents and in the context of this investigation, I believe that when **NEAL W** told **KIMBERLY W** that he was going to lock the room, he was referring to their bedroom located in their residence, 7253 Michael Terrace, and wanted to make sure that **KIMBERLY W** had a key. **NEAL W** stated that he had to hide everything, possibly referring to narcotics, money, and/or other contraband.  **KIMBERLY W** directed **NEAL W** to go ahead and lock the door.  **KIMBERLY W** and **NEAL W** then spoke about a damaged vehicle and an insurance claim.  At approximately 1342 hours, the GPS location data for **NEAL W's** cellular device showed that he was within one meter of the residence.

53.     On April 5, 2021, at 0849 hours, agents intercepted an outgoing call to PORSCHEE W, utilizing (904) 487-7319,[19] from **TARGET TELEPHONE 3**. The call is transcribed below.

PW:   Hello?

KW:   Hey.  They ain't got nothing but 23 out there.  You think you could do one or two bombs, um, one or two hundred bombs right quick for me? [UI] They ain't got nothing but 23.  Ashley called asking, um, trying to get, um, the [UI] so y'all can just [audio glitch] [UI] y'all [UI] with her. But [UI] y'all can come up with two of them real quick [UI]?  Um [UI] [Voices overlap]

PW:   Alright.

KW:   They ain't got nothing but 23.  I'm on my way up to pick Tye up.

PW:   [UI] or Gainsville?

KW:   They flew her, they flew her to Gainsville [UI] to Gainsville.  Uh, her daddy say [Voices overlap]

PW:   Oh [Voices overlap]

KW:   Maybe just [UI] he said that, um, say they don't want to take the bullet out cause it may cause more damage, cause more damage than it do [UI].  Right now, they wanna just leave it there.

---

[19]     Telephone number (904) 487-7319 was listed as PORSCHEE W's number in a JSO report of July 20, 2020, which I have reviewed.

PW:     [UI] gonna do that?

KW:     [UI] out here, but they, uh, he had two, the last two he had last night. Kei . . . [audio glitch] she say she was getting up to try to get some, did too, to try to get 'em something.

PW:     Hmm [Voices overlap]

KW:     And they ain't have no halves.  The [audio glitch] [UI] for, need somebody to grab the ones, uh, the halves, from the house when [audio glitch] when they take it out there.  They, they, um, when they take the w . . . when you take the white out there, drop the, um, come by here and grab these, these halves.

PW:     [UI].

KW:     Or you can go back to sleep while she [audio glitch] while she get her [UI] right quick and [UI] Keish down out there.

PW:     Okay.

KW:     Alright, then, get, grab the halves from over here.

PW:     Alright.

KW:     Alright, then.

[CALL ENDS]

54.     Based on the training and experience of the agents and in the context of this investigation, I believe **KIMBERLY W** advised **PORCSHEE W** that they did not have enough controlled substances, only 23, at the 14th Street "trap house".  "23" likely refers to a quantity of bags containing a controlled substance, packaged for

distribution.  **KIMBERLY W** asked PORSCHEE W if she could do one or two

hundred bombs real quick, likely referring to bagging up 100 or 200 bags of narcotics

for distribution.  As noted above, a "bomb" is a term commonly used to refer to a

bag containing various types and quantities of narcotics packaged for sale.

**KIMBERLY W** said that she was on the way to pick up BRANDIESA W.

**KIMBERLY W** then talked about BRANDIESA W being shot and her medical

condition.  **KIMBERLY W** then stated that an unidentified male was down to "the

last two he had last night," believed to be referring to a quantity of controlled

substance.  **KIMBERLY W** said "Keish", believed to be referring to Lakeisha Allen,

the sister of **KIMBERLY W**,[20] was bagging some of the narcotics as well to try to get

some to the unidentified male, likely the person working a shift at the 14th Street

"trap house."  **KIMBERLY W** said that they did not have any halves, so she needed

someone to grab the halves, referring to a quantity of a controlled substance from the

house, meaning her residence at 7253 Michael Terrace, on the way to take the

suspected narcotics to the 14th Street "trap house".

55.     On April 5, 2021, at 1518 hours, agents intercepted an outgoing call to

PORSCHEE W, utilizing (904) 487-7319, from **TARGET TELEPHONE 3.**  The

call is transcribed below.

---

[20]     I have reviewed records for both **KIMBERLY W** and Lakiesha Lakay
Allen contained within DAVID.  These records include birth certificates for both of
them, each of which lists their mother as Jo Anne Arthur.  I also have reviewed
**KIMBERLY W**'s Facebook account and she lists Lakiesha Allen as her sister under
the heading "Family Members."

PW:   Hello

KW:   Hey, what's going on?

PW:   Hey, where that, uh, where that's at you, I haven't had time yet . . .

KW:   It right there on the round in the bathroom on the counter, on the
      bathroom counter, where the hammer usually be.

PW:   Is it in [UI] blue bag?

KW:   Huh?

PW:   I said is it in this blue bag?

KW:   I don't know, I don't know if I bagged this up.

NW:   It's two bags.

PW:   Uh-huh.  Oh, I see it.

KW:   Yeah, them.

PW:   It's up on here on the counter, sitting up here with the other one.

KW:   And them three go to Keisha, and the . . .

PW:   Oh, so . . .

KW:   And the other one, the other stuff go with you for there.

PW:   Okay, so these three right here Keisha's.

KW:   Yeah, go to Keisha first.

PW:   Yeah.

KW:   Alright.

PW:   I got you.

KW:   Alright.

PW:   Okay.

[CALL ENDS]

56.     Based on the training and experience of the agents and in the context of this investigation, I believe **KIMBERLY W** was directing PORSCHEE W to the location of several bags of controlled substances in her residence at7253 Michael Terrace, specifically on her bathroom counter.  PORSCHEE W asked if the narcotics were in the blue bag.  **KIMBERLY W** stated that she did not know if she bagged it up, believed to be referring to narcotics and **NEAL W** then stated "it", referring to the suspected narcotics, was in two bags.  PORSCHEE W stated that she saw it and described it is on the counter next to the other one, again believed to be referring to narcotics.  **KIMBERLY W** then instructed PORSCHEE W that the three bags were for "Keisha", believed to be referring to Lakeisha Allen.

57.     On April 6, 2021, at 2056 hours, agents intercepted an outgoing text to **PETERSON,** utilizing **(386) 288-1906**, from **TARGET TELEPHONE 3**.  The text conversation between **PETERSON** and **KIMBERLY W** is detailed below.

KW:   Deal wanna know is everything good over your way?

MP:   I'm hoping thursday

KW:   No we hoping yesterday day  ♀

KW:   You got a half we can relieve you of?

MP:   They hit me hard yesterday I don't know where they getting all this change from

KW:   Huh shoot you got anything for us?

KW:   ???

KW:   Have you talked to her yet?

MP:   Yea suppose to be thru day

MP:   Thursday

KW:   For sho Thursday?

KW:   I want 1 and a half-2

58.      Based on the training and experience of the agents and in the context of this investigation, I believe **KIMBERLY W** was contacting **PETERSON** to see if he had any controlled substance, believed to be a-PVP on hand.  **PETERSON** stated that "they hit me hard", referring to the large amount of customers that he had come to purchase narcotics from him.  **KIMBERLY W** then asked **PETERSON** if he had anything for "us", referring to **NEAL W** and herself.  **KIMBERLY W** also asked if **PETERSON** had spoken to "her", believed to be in reference to **PETERSON**'s unidentified female source of supply.  **PETERSON** stated that he had spoken to his source of supply and that the narcotics should be arriving on Thursday, believed to be in reference to April 8, 2021.  **KIMBERLY W** asked if it would be Thursday for sure when the narcotics arrive, and requests "1 and a half to 2", believed to be in reference to kilogram quantities of a-PVP.

## FINANCIAL INVESTIGATION

59.     Internal Revenue Service-Criminal Investigations Special Agent Chris
Pekerol has conducted an investigation of the finances of **NEAL W** and
**KIMBERLY W** and he has related to me what the investigation revealed.  In sum,
the investigation has revealed that **NEAL W** and **KIMBERLY W** have earned
substantial amounts of money through their drug trafficking enterprise and have
laundered their proceeds through limited liability companies, financial institutions,
real estate investments, a BP gas station/convenience store, and purchases of
vehicles and jewelry.

60.     The investigation also revealed that neither **NEAL W** nor **KIMBERLY
W** have any significant source of legitimate income.  Internal Revenue Service
("IRS") and Florida Department of Revenue records show that **KIMBERLY W** was
last employed in 2017.  **KIMBERLY W**'s 2017 federal income tax return reported
total income of $23,167.00, which was reported as wages paid by CERES Marine
Terminals Inc.  IRS records show that **KIMBERLY W** reported no income for the
years 2018 and 2019.  IRS records show that **NEAL W** reported no income for the
years 2017, 2018, and 2019.  IRS information returns and Florida Department of
Revenue records show that **NEAL W** was last employed in 2017 by Archer Western
Construction, where he earned $2,754.00 for the year.

61.     During the course of the investigation, law enforcement identified
dozens of bank accounts associated with Neal and **KIMBERLY W**'s drug trafficking

and money laundering enterprise.  Financial analysis revealed that since January 1, 2018, over $1,000,000.00 has passed through these bank accounts.

62.    Florida Division of Corporations records show that in 2019 **NEAL W** and **KIMBERLY W** established the limited liability companies K&N Lawn N Pressure Washing Service, Walkers Property Investment, and K&N Investment Properties.  Businesses in the State of Florida are required to file quarterly employer reports with the Florida Department of Revenue and pay reemployment taxes on wages paid to employees.  A query of Florida Department of Revenue records showed that none of **NEAL W**'s or **KIMBERLY W**'s businesses have filed any quarterly employer reports.  In addition, IRS records show no tax filings by K&N Lawn N Pressure Washing Service, Walkers Property Investment, or K&N Investment Properties.  I know, based my knowledge and experience and conversations with SA Pekerol that drug traffickers and money launderers will often use limited liability companies and business entities to disguise and "clean" illicit funds.

63.    Duval County records show that on or about July 17, 2019, K&N Investment Properties LLC purchased three tax deeds at auction from the Duval County Clerk of Court for a total of $53,199.00.  Payment was provided to the Duval County Clerk of Court in the form of seven (7) cashier's checks and $200.00 cash. The cashier's checks were purchased by **KIMBERLY W**, **NEAL W**, BRANDIESA W, PORSCHEE W, ASHLEY W, Lashanda Walker, and David Geathers.  The

cashier's checks ranged in amounts between $7,500.00 and $8,000.00, were purchased on or about the same day, and were structured in amounts under $10,000.00.

64.     31 U.S.C. § 5313 requires any financial institution that engages with a customer in a currency transaction in excess of $10,000.00 to report the transaction to the Department of Treasury on FinCEN Form 104, Currency Transaction Report ("CTR"). I know, based on my knowledge and experience and conversations with SA Pekerol, that many individuals involved in illegal activities are aware of CTR reporting requirements and take steps to evade the reporting requirements. These steps are often referred to as "structuring" and involve dividing a sum of money greater than $10,000.00 and making multiple cash transactions, in amounts less than $10,000.00, in order to evade the $10,000.00 reporting requirement.

65.     Duval County records show that on or about January 15, 2020, Walkers Property Investment LLC purchased two tax deeds at auction from the Duval County Clerk of Court for a total of $45,323.10.  Payment was received in the form of seven (7) cashier's checks.  The cashier's checks were purchased by **KIMBERLY W**, **NEAL W**, BRANDIESA W, PORSCHEE W, ASHLEY W, **MICKLER**, and Leshanda Walker.  The cashier's checks ranged in amounts between $6,000,00 and $7,000.00, were purchased on or about the same day, and again appeared to be structured in amounts under $10,000.00 to avoid the filing of CTRs.  Based on the investigation, your affiant knows BRANDIESA W, PORSCHEE W, ASHLEY W, **MICKLER**, and Leshanda Walker, to be **NEAL W**'s

and **KIMBERLY W**'s adult children and David Geathers to be BRANDIESA W's boyfriend.  It appears that **NEAL W** and **KIMBERLY W** used their family members and associates to structure cash transactions and purchase the cashier's checks used to acquire the tax deeds.

66.    During the course of the investigation, law enforcement obtained and reviewed records from Navy Federal Credit Union ("NFCU"), First Federal Credit Union ("FFCU"), and Community First Credit Union ("CFCU").  The records revealed that **NEAL W**, **KIMBERLY W**, ASHLEY W, BRANDIESA W, **MICKLER**, Leshanda Walker, David Geathers, and PORSCHEE W each made cash deposits, structured in amounts under $10,000.00, at financial institutions and used the funds to purchase the aforementioned cashier's checks made payable to the Duval County Clerk of Court. The following are summaries of those financial transactions:

| Summary of Structured Cash Deposits | | | |
|---|---|---|---|
| Date | Amount | Account Holder | Bank |
| 7/17/2019 | $7,500.00 | Kimberly Walker | NFCU |
| 7/17/2019 | $7,500.00 | Neal Walker | NFCU |
| 7/18/2019 | $7,500.00 | Ashley Walker | NFCU |
| 7/18/2019 | $7,500.00 | Porschee Walker | NFCU |
| 7/18/2019 | $7,500.00 | Brandiesa Williams | CFCU |
| 7/18/2019 | $8,000.00 | Leshanda Walker | FFCU |
| 7/18/2019 | $7,500.00 | David Geathers | CFCU |
| Total | $53,000.00 | | |
| | | | |
| 1/16/2020 | $1,030.00 | Ashley Walker | NFCU |
| 1/16/2020 | $4,990.00 | Ashley Walker | NFCU |
| 1/16/2020 | $520.00 | Ashley Walker | NFCU |
| 1/16/2020 | $6,621.00 | Brandiesa Williams | NFCU |

| 1/16/2020 | $4,501.00 | Kimberly Walker | NFCU |
|---|---|---|---|
| 1/16/2020 | $1,830.00 | Kimberly Walker | NFCU |
| 1/16/2020 | $6,560.00 | Marquez Mickler | NFCU |
| 1/16/2020 | $6,331.00 | Neal Walker | NFCU |
| 1/16/2020 | $6,465.00 | Porschee Walker | NFCU |
| 1/16/2020 | $70.00 | Porschee Walker | NFCU |
| 1/16/2020 | $6,532.00 | Leshanda Walker | FFCU |
| Total | $45,323.01 | | |

| Summary of Cashier's Checks | | | | |
|---|---|---|---|---|
| Date | Amount | Bank | Purchaser | Payee |
| 7/17/2019 | $7,500.00 | NFCU | Kimberly Walker | Duval County Clerk |
| 7/17/2019 | $7,500.00 | NFCU | Neal Walker | Duval County Clerk |
| 7/18/2019 | $7,500.00 | NFCU | Ashley Walker | Duval County Clerk |
| 7/18/2019 | $7,500.00 | NFCU | Porschee Walker | Duval County Clerk |
| 7/18/2019 | $7,500.00 | CFCU | Brandiesa Williams | Duval County Clerk |
| 7/18/2019 | $8,000.00 | FFCU | Leshanda Walker | Duval County Clerk |
| 7/18/2019 | $7,500.00 | CFCU | David Lee Geathers | Duval County Clerk |
| Total | $53,000.00 | | | |
| | | | | |
| 1/16/2020 | $6,532.84 | NFCU | Ashley Walker | Duval County Clerk |
| 1/16/2020 | $6,532.84 | NFCU | Brandiesa Williams | Duval County Clerk |
| 1/16/2020 | $6,532.84 | NFCU | Marquez Mickler | Duval County Clerk |
| 1/16/2020 | $6,330.04 | NFCU | Neal Walker | Duval County Clerk |
| 1/16/2020 | $6,532.84 | NFCU | Porschee Walker | Duval County Clerk |
| 1/16/2020 | $6,330.45 | NFCU | Kimberly Walker | Duval County Clerk |
| 1/16/2020 | $6,532.00 | FFCU | Leshanda Walker | Duval County Clerk |
| Total | $45,323.01 | | | |

67.     After purchasing the properties described above, it appears that **NEAL W** and **KIMBERLY W** leased the properties to tenants and began collecting rents. NFCU records show that on or about December 10, 2019, **KIMBERLY W** opened a business checking account ending in 9896 and titled the account Walkers Property Investment LLC.  The records list the address for Walker Property Investment LLC as 7253 Michael Terrace, Jacksonville, FL 32222, which, as noted above, is the

residence of **KIMBERLY W** and **NEAL W**.  Between December 10, 2019, and

November 18, 2020, the account ending in 9896 received deposits totaling

approximately $101,496.00.  These deposits consisted primarily of cash and money

orders.  Many of the money orders noted addresses and appeared to be rent

payments.

68.    NFCU records show that on or about June 13, 2019, **KIMBERLY W**

and **NEAL W** opened a business checking account ending in 4435 and titled the

account K&N Lawn N Pressure Washing Service LLC.  The records list the address

for K&N Lawn N Pressure Washing Service LLC as 7253 Michael Terrace,

Jacksonville, FL 32222.  A review of the account revealed activity inconsistent with

the operations of a legitimate lawn care or pressuring washing business.  Records

show that the account was funded almost entirely by cash deposits.  Between June

13, 2019, and November 30, 2020, approximately $330,072.00 of U.S. currency was

deposited into account ending in 4435.  There were no deposits of checks from

clients or merchant account deposits for credit card transactions to the account.

Further, debits from the account appeared to be personal in nature and unrelated to

the operation of a legitimate lawn care or pressuring washing business.  For example,

there were no payments from the account for payroll or lawn care equipment,

however there were 20 transactions totaling $3,846.00 at True Religion (a designer

jean company), nine transactions totaling $17,310.00 at Versace (a luxury clothing

company), and five transactions totaling $2,646.00 at Ticketmaster for concert

tickets.  In June, 2020, the pattern of account activity changed.  The account

continued to receive large cash deposits, but expenses appeared consistent with operating a gas station/convenience store. For example, between June 4, 2020, and November 30, 2020, the account paid approximately $247,228.00 to Giant Jacksonville LLC, a gasoline services and distribution company.

69.     Further investigation revealed that in or about May, 2020, **KIMBERLY W** entered into an agreement with Giant Jacksonville LLC to occupy and operate a BP gas station / convenience store located at 6845 Arlington Expressway, Jacksonville, Florida. Surveillance has shown that this BP gas station accepts credit cards at the gas pumps and inside the store. However, no credit card/merchant account deposits were made to the NFCU account ending in 4435. The account was funded almost entirely by cash deposits and those cash deposits were used to fund the operations of the gas station. Therefore, it is believed that **KIMBERLY W** and **NEAL W** use the gas station and its associated bank accounts to "clean" cash derived from their drug trafficking activity.

## CONCLUSION

70.     Based on the foregoing, I submit that there is probable cause to believe that **KIMBERLY W, NEAL W, PETERSON, MICKLER, BELL,** and **ASTIN** have conspired with each other and others to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).

Accordingly, I respectfully request the issuance of criminal complaints and arrest

warrants charging these individuals with these offenses.

Alyse Simmons
Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Subscribed and sworn to before me
this __/2__ day of April, 2021.

JOEL B. TOOMEY
United States Magistrate Judge